**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles V. HARRELSON, et
al., Defendants,**

v.

**EL PASO TIMES, INC., et al.,
Movants-Appellants.**

**In re EL PASO TIMES, INC., the
Associated Press and Patrick
Wier, Petitioners.**

**Nos. 83–1095, 83–1107.**

United States Court of Appeals,
Fifth Circuit.

Sept. 6, 1983.

---

**8.** Accordingly, U.S. Fire's other claims of error    need not be reached.

Scott, Hulse, Marshall, Feuille, Finger & Thurmond, Richard Munzinger, El Paso, Tex., for movants-appellants and petitioners.

Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, GEE, and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

At issue on this appeal is the constitutional validity of two restrictions on post-verdict interviews with jurors by the press: that forbidding repeated importunings for interviews and that forbidding inquiry into specific votes by other jurors. We uphold both.

### Facts and Procedural History

On December 14, 1982, a jury found Charles V. Harrelson, Elizabeth Chagra and Jo Ann Harrelson guilty of various acts and conspiracies with regard to the May 1979 murder of the Honorable John H. Wood, Jr., United States District Judge.[1] As the district court was discharging the jurors following their verdict, it admonished that its Local Court Rule 500–2 was applicable and that all persons were prohibited from approaching, questioning, or interviewing any juror, or his relatives, friends, or associates, concerning the jury's deliberations, except with leave of court granted upon good cause shown. Rule 500–2 provides:

> No ... attorney or any party to an action or any other ... person shall himself or through any investigator or other person acting for him interview, examine or question any juror, relative, friend or associate thereof either during the pendency of the trial or with respect to the deliberations or verdict of the jury in any action, except on leave of court granted upon good cause shown.

After the jury's verdict, appellants filed a Motion of Non-Parties to Interview Jurors requesting that the district court vacate its intended enforcement of Rule 500–2 as an unconstitutional restraint on their freedoms of speech and press. Appellants requested that they be permitted to interview the discharged jurors "without restriction of any sort whatsoever." On December 21, 1982, the district court entered its Memorandum Opinion and Order denying the Motion of Non-Parties to Interview Jurors. The district court refused to accept appellants' characterization of Rule 500–2 as a "prior restraint" carrying a heavy presumption against its constitutional validity, viewing it instead as only a "restraint on access, but not as a prior restraint on speech, expression or publication." Although the district court recognized that Rule 500–2 had an "incidental effect on news gathering," it held that the Rule served the interest of justice since it preserved the confidentiality of jury deliberations. In response to the district court's order, appellants filed an Application for Writ of Mandamus (No. 82–1729) with this court seeking a writ directing the district court to vacate its Order enforcing Rule 500–2. The application was denied.

On December 30, 1982, this court decided *In re The Express-News Corporation*, 695 F.2d 807 (5th Cir.1982), holding that Rule 500–2, and the district court's order enforcing it, were unconstitutional as applied to post-verdict interviews sought to be conducted with discharged jurors by the Express-News Corporation in an unrelated criminal case.

In response to the *Express-News* decision, appellants filed a Motion to Vacate Memorandum Opinion and Order in the district

---

[1]. Two additional defendants, Jamiel Alexander Chagra, and Joseph Salem Chagra, were named in the indictment. Joseph Salem Chagra entered a plea of guilty before the trial of the Harrelsons and Elizabeth Chagra. Jamiel Alexander Chagra was tried separately after his wife and the Harrelsons were convicted.

court, noting that *Express-News* had held Rule 500–2 and the district court's Order enforcing it unconstitutional and asking the district court to vacate its prior order enforcing the Rule in the instant case. On January 5, 1983, the district court denied the Motion to Vacate, declining to follow *Express-News* because that decision was not yet final and the mandate had not issued. In its Order, the district court ruled that *Express-News* had not held the Rule unconstitutional on its face, thus leaving the court with "considerable latitude in applying Rule 500–2;" the district court indicated that when *Express-News* became final and the mandate issued it would take the "appropriate action."

In light of the *Express-News* decision and the district court's continued refusal to vacate its prior order enforcing Rule 500–2, on January 11, 1983, appellants filed with this court an Emergency Motion for Reconsideration of Denial of Application for Writ of Mandamus. A panel denied this motion on January 19, stating that the writ need not issue because the district court had indicated that it would "carefully reconsider" its prior orders once the mandate was issued in the *Express-News* case.

On January 21 appellants filed with the district court their Motion to Vacate Restrictions on Interviews of Discharged Jurors, again requesting the district court to lift immediately all limitations on the proposed interviews of the discharged jurors because the mandate in the *Express-News* case had issued and the decision had become final.

On January 26 the district court signed the Order presently before us on appeal, partially granting this last Motion to Vacate: The Order, however, imposed four restrictions on proposed interviews with the discharged jurors:

1. No juror has any obligation to speak to any person about this case, and may refuse all interviews or comment.

2. No person may make repeated requests for interviews or questioning after a juror has expressed his or her desire not to be interviewed.

3. No interviewer may inquire into the specific vote of any juror other than the juror being interviewed.

4. No interview may take place until each juror in this case has received a copy of this order, mailed simultaneously with the entry of this order.

Appellants readily admit that a discharged juror has no obligation to speak to any person about the case but contend that the other restrictions are unconstitutional restraints on the exercise of their freedoms of speech and press. The focus of this appeal and the companion mandamus action is upon restrictions two and three of the Order. Appellants do not attack numbers one and four.

At appellants' request, we have consolidated this appeal with appellant's Application for Writ of Mandamus (No. 83–1107) which complains of the same provisions of the district court's Order.

### Analysis and Discussion

◼ Again, as in *Express News,* the field of battle is the area of tension between the First Amendment right to gather and publish information and the Sixth Amendment's guarantee of fair trial. We there noted the general principles governing decision of controversies such as this, supporting them with citation of authorities. 695 F.2d, at 809–10. We reiterate them summarily here: that the First Amendment right to gather news is neither absolute nor does it provide journalists with special privileges denied other citizens; that it must yield to an accused's right to a fair trial; but that restrictions upon it are permissible only to prevent a substantial threat to the administration of justice. In this connection, jurors, even after completing their service, are entitled to privacy and to protection against harassment.

Before addressing the merits of the restrictions imposed we dispose of two contentions extraneous to them. The press appellants assert—or at least insinuate—on brief that the press is singled out by the court's order, which supposedly subjects the press to restraints not applicable to others.

This is not so. The two restrictions complained of to us commence, respectively: "No person" and "No interviewer." Broader general language is unimaginable; this applies to the press, to the lady next door, to other jurors, and to the rest of the world. Complaint is also made that although jurors are not forbidden to disclose the votes of other jurors voluntarily, no interviewer may ask them to do so. We see no legal force in this complaint, which seems to find fault with the order as insufficiently broad a restraint on freedom of speech. The press appellants have no standing to complain that another's freedom to speak has *not* been restrained. If the complaint is intended as some species of equal protection argument, it fails since the two groups—the press and former jurors—are not similarly situated. Had the newspapers been restrained while radio news reporters were not, such a complaint would have force.

■ The second threshold contention is that the court's order was imposed without an evidentiary hearing and without findings of fact regarding any substantial threat to the administration of justice in this particular instance. Though this is a shot somewhat closer to the mark, we are not persuaded. A federal judge is not the mere moderator of a jury trial; he is its governor for the purpose of insuring its proper conduct. *Herron v. Southern Pacific Co.,* 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1935). As such, he exercises a broad discretion, based on the law and on his own and common experience, over many of its aspects: the admission and exclusion of evidence, the extent of examination and cross-examination, and the handling of the jurors. It is for him to decide, for example, whether or not they are to be sequestered, what restrictions are to be placed on their access to outside information, and the like. He need neither hold hearings to justify nor make fact-findings to support his orders in such matters. And while it is possible for him to act with undue restrictiveness in such matters, it is also possible for him to be too lax and to suffer reversal for that reason. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). This is especially true of widely publicized or sensational cases; convictions in such cases have been set aside on such grounds even without a showing of specific prejudice. *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Nor does his power to prevent harassment of jurors end with the case. *In Re Express-News Corp., supra; United States v. Gurney,* 558 F.2d 1202 (5th Cir.1977).

The trial of Judge Wood's assassins was as widely followed and publicized a one as could well be imagined. No hearing was required to ascertain this, nor was one requisite to a determination that reporters are persistent and tenacious in pursuing information and that they seek it regarding the nonpublic portions of legal proceedings (jury deliberations, bench conferences between court and counsel, excluded evidence, etc.) as well as the public ones. *See, e.g., Gurney, supra.* These are truisms known to all, and if they form a sufficient basis for the court's order, it is not invalid merely because he held no unnecessary hearing and wrote no redundant findings of fact concerning them before handing it down. Specific matters outside common knowledge, however, doubtless could not be urged in support of the order without such a proceeding. None are here. Having disposed of these contentions, we turn to the specific portions of the order complained of.

### The Ban on Repeated Requests for Interviews

"No person may make repeated requests for interviews or questioning after a juror has expressed his or her desire not to be interviewed."

We first consider the press appellants' attack on this portion of the order as too vague to give fair notice of what conduct is prohibited. It must be conceded that portions of the passage, like most nonmathematical statements, are subject to construction. Any fair-minded construction of these, however, can lead to but one result. We observed earlier that "No person" can have but one meaning: no one—not the judge, not another juror, not Mrs. Grundy, and not the President of the United States.

"Repeated requests" means more than one; any request beyond one is a repeated one. Mathematical certainty is not necessary; what is forbidden is wheedling and importuning. And even this is only partly forbidden; the juror is fair game until he expresses his desire not to be interviewed in such a manner that the would-be interviewer knows of that desire. The press appellants' suggestion that a finding of contempt might follow upon a showing that a juror was approached after making a private expression of disinclination—as by telling her husband, whispering into a closet, or advising a neighbor—is absurd.

Little more need be said in order to dispose of the attack on this portion of the order. It is settled in our circuit that "jurors, even after completing their duty, are entitled to privacy and to protection against harassment." *In re Express-News Corp.,* 695 F.2d at 810. We see no room for doubt that at *some* point repeated importunings of one who has declined to be interviewed became harassment and an improper invasion of his privacy. Thus the question becomes one of degree; how many turndowns are too many? One? three? fifteen?

The trial court concluded that one request made after a known refusal to be interviewed was enough to allow and that more—repeated requests—were too many. We cannot say that in so concluding he abused his discretion. Common sense tells us that a juror who has once indicated a desire to be let alone and to put the matter of his jury service behind him by declining to be interviewed regarding it is unlikely to change his mind; and if he does, he is always free to initiate an interview. The court's order does no more than forbid nagging him into doing so. We are in no position to conclude that requiring two, or three, or twenty turndowns would be the better rule. We decline to do so and uphold this portion of the court's order.

### The Ban on Inquiry into Specific Votes of Other Jurors

"No interviewer may inquire into the specific vote of any juror other than the juror being interviewed."

We must now determine the validity of the above "rule narrowly tailored to prevent the disclosure of the ballots of individual jurors," a matter on which we expressly declined comment in *Express-News,* 695 F.2d, at 811. Our ruling requires little more than a specific application of the general principles announced in *United States v. Gurney,* 558 F.2d 1202 (5th Cir.1977).

There we held generally that members of the press, in common with all others, are free to report whatever takes place in open court but enjoy no special, First Amendment right of access to matters not available to the public at large. The particulars of jury deliberation fall in the latter class, and the court's narrow restriction was well within its discretion. As the Supreme Court observed, in the course of assuming the existence of a common-law privilege against forced disclosure of such matters:

> Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.

*Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 468, 77 L.Ed. 993 (1933) (Cardozo, J.).

Mandamus is DENIED. The order appealed from is AFFIRMED.